# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Montel Pullen, Sharnell Grandberry, Dominique Stewart,** and **Adrian Williams**, individually, and on behalf of others similarly situated, | Case No. |
| Plaintiffs, | Hon. |
| v. | **Complaint** |
| **McDonald's Corporation; McDonald's USA, LLC; and ECS Partnership d/b/a McDonald's Restaurant**, | Jury Trial Demanded<br>Class and Collective Action |
| Defendants. | |

Edgar N. James (D.C. Bar No. 333013)
David P. Dean (D.C. Bar No. 437030)
Jeff Vockrodt (D.C. Bar No. 985635)
Darin M. Dalmat (D.C. Bar No. 978922)
Ryan E. Griffin (D.C. Bar No. 1007078)
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave., Suite 950, NW
Washington, DC 20036
202-496-0500
202-496-0555 (fax)
ejames@jamhoff.com
dpdean@jamhoff.com
jvockrodt@jamhoff.com
dmdalmat@jamhoff.com
regriffin@jamhoff.com

John R. Canzano (MI Bar No. P30417)
Darcie R. Brault (MI Bar No. P43864)
McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.
400 Galleria Officentre, #117
Southfield, MI 48034
248-354-9650
248-354-9656 (fax)
jcanzano@michworklaw.com
dbrault@michworkerlaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Introduction ................................................................................................. 1

Jurisdiction and Venue .............................................................................. 3

Parties ......................................................................................................... 3

I.     The Plaintiffs .................................................................................... 3

II.    The Defendants ................................................................................ 6

General Allegations .................................................................................... 9

I.     McDonald's Corporate, along with ECS McDonald's, employs Plaintiffs
       and similarly situated Crew Members .............................................. 9

       A. ECS McDonald's employs the Plaintiffs and similarly situated
          Crew Members, within the traditional common-law framework
          for master-servant employment relationships ........................... 10

       B. McDonald's Corporate, along with ECS McDonald's, employs the
          Plaintiffs and similarly situated Crew Members, within the
          statutory framework for employment relationships established by
          the wage statutes ..................................................................... 12

          1)  Like employees at all McDonald's restaurants, Plaintiffs and
              similarly situated Crew Members perform specialty jobs at
              ECS McDonald's on the production line developed and operated
              as the McDonald's System, which functions as an integrated
              economic unit ..................................................................... 12

          2)  The responsibilities under McDonald's Franchise Agreements,
              like the one it has with ECS McDonald's, are materially the
              same across franchisees ...................................................... 17

          3)  McDonald's Corporate's premises and equipment are used for
              Plaintiffs' and similarly situated Crew Members' work at
              ECS McDonald's ................................................................. 19

i

4) ECS McDonald's cannot, as a contractual or practical matter, shift its business organization as a unit from the McDonald's System to any other fast-food restaurant chain ...................................20

5) McDonald's Corporate keeps close tabs on ECS McDonald's operation ...........................................................................20

6) Although ECS McDonald's profits depend in part on the efficiency of its operation, the profitability of that franchised restaurant—like other McDonald's System restaurants—depends predominantly on decisions made by McDonald's Corporate and other factors outside of ECS McDonald's control, rather than on the initiative, judgment, or foresight of ECS McDonald's.........................................................24

C. McDonald's Corporate, along with ECS McDonald's, also employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships ................................................................................24

1) McDonald's Corporate substantially and effectively controls the hiring and firing of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants......................................................................25

2) McDonald's Corporate substantially and effectively controls the schedules of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants......................................................................27

3) McDonald's Corporate substantially and effectively controls other employment conditions of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants......................................................................29

4) McDonald's Corporate maintains extensive employment records relating to the work performed by workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants .................................................34

II.   Plaintiffs and similarly situated Crew Members have been engaged to wait without receiving minimum wages—or any compensation at all —for that compensable work .........................................................35

III.  Plaintiffs and similarly situated Crew Members have had the cost of their required uniforms deducted from their wages, driving those wages below the minimum wage required by the wage statutes ........................................38

IV.   Notwithstanding their extensive recordkeeping, McDonald's Corporate and ECS McDonald's have failed to keep fully accurate records required by law ...............................................................................................39

V.    McDonald's Corporate and ECS McDonald's have committed these violations willfully .............................................................................40

Collective Actions Allegations ...........................................................41

Class Action Allegations...................................................................42

First Cause of Action: Waiting-Time Violations of the FLSA................................46

Second Cause of Action: Uniform-Deduction Violations of the FLSA .................46

Third Cause of Action: Waiting-Time Violations of the MWL ............................48

Fourth Cause of Action: Uniform-Deduction Violations of the MWL .................49

Fifth Cause of Action: Breach of Contract Under Michigan Common Law..........50

Sixth Cause of Action: Unjust Enrichment (Quantum Meruit) Under Michigan Common Law.................................................................................51

Jury Demand .................................................................................52

Prayer for Relief.............................................................................52

iii

**Introduction**

1.  McDonald's is a chain of fast-food restaurants, some owned and operated by the chain's corporate parents and others by franchisees. Together, both types of restaurants and the corporate parents (who are also the franchisor) form a unified business system—the self-proclaimed McDonald's System—that operates through uniform standards established and monitored by the chain's corporate parents, with the dominant aim of making the corporate parents profitable and the secondary aim of ensuring profitability for the component parts, so as to contribute to the profitability of the McDonald's System as a whole.  As such, the McDonald's System functions in reality as an integrated economic unit. By adhering consistently to the corporate standards, the McDonald's System generated $27 billion dollars in revenue last year, while nominally paying minimum wages to the vast majority of its workers—the people who cook and serve its world-famous hamburgers, ring up its customers, clean its restaurants, and present the face of Ronald McDonald to the world.

2.  The Plaintiffs in this case work at franchised McDonald's restaurants in the Detroit metropolitan area. They bring this Complaint on behalf of themselves and their thousand-strong fellow Crew Members who work for the same franchisee.

3.  They have come to this Court seeking relief for two kinds of violations of federal and state wage laws.

4.  First, they challenge McDonald's practice of just-in-time labor staffing. Under that practice, McDonald's carefully schedules the labor it needs each week to maximize daily profits, using sales projections based on historical data. When a

1

day's sales do not keep up with those projections, McDonald's makes just-in-time adjustments to its staffing requirements by taking employees off the clock—and off the payroll—for the minutes or, sometimes, even hours that McDonald's determines necessary to maintain its profit targets at every moment throughout the day. Meanwhile, those workers—who had been scheduled to work that day—must wait. They cannot effectively use that time to work at another job or even to enjoy their leisure.

5. Pullen, Grandberry, and the entire McDonald's Crew have the right to be paid fair compensation for their work. When McDonald's engages them to work by waiting idly until business picks up again, the law requires it to pay them at least minimum wages for that time. Pullen, Grandberry, and their colleagues, however, have not been paid at all for the time that McDonald's engaged them to wait. They now seek relief for that injury from this Court.

6. Second, Pullen, Grandberry, and their colleagues challenge McDonald's practice of charging them for the Golden Arches uniforms it requires them to wear to minimum-wage work. McDonald's has invested significantly over the years in the value of its image. It profits by advertising its instantly-identifiable logo throughout the world. Usually, McDonald's pays for the cost of that advertising. But not always: McDonald's also advertises its Golden Arches by requiring Pullen, Grandberry, and their colleagues to wear Golden Arches uniforms to perform work at McDonald's. McDonald's requires these minimum-wage workers to pay for the costs of that advertising by making them purchase their uniforms. In conscripting its employees' work clothes for its advertising space at the employees' expense,

2

McDonald's drives their actual hourly wages below legally required minimums. The Plaintiffs also seek relief for that injury.

## Jurisdiction and Venue

7.   This Complaint alleges causes of action under a law of the United States, the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. §§ 201, *et seq.* This Court therefore has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

8.   This Complaint also alleges causes of action under the laws of the State of Michigan, including the Minimum Wage Law of 1964 ("**MWL**"), Mich. Comp. Laws §§ 408.381, *et seq*., and common law. The state-law causes of action alleged in this Complaint are so related to the federal-law claims in this action that they form part of the same case or controversy under Article III of the United States Constitution. This Court thus has subject-matter jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

9.   Each of the Defendants in this action resides in this judicial district within the meaning of 28 U.S.C. § 1391(d). Venue is thus proper here under 28 U.S.C. § 1391(b)(1).

10.  A substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district. Venue is thus also proper here under 28 U.S.C. § 1391(b)(2).

## Parties

**I.  The Plaintiffs**

11. **Montel Pullen** is a Michigan resident.

3

    a. From early 2010 through the present, he has been employed at the McDonald's restaurant located at 14124 Woodward Avenue in Highland Park, Michigan.

    b. Throughout that employment, he has been at least 16 years of age.

    c. Throughout that employment, Pullen has been paid on an hourly basis.

    d. His nominal rate of pay throughout that employment has been $7.50 per hour.

    e. Pullen's duties during that employment include, among other things, maintenance, cleaning, and food preparation.

    f.  Pullen's written consent to join this action is attached as Exhibit A to this Complaint.

12. **Sharnell Grandberry** is a Michigan resident.

    a. From about May 2012 through the present, she has been employed at the McDonald's restaurant located at 9815 Grand River Avenue in Detroit, Michigan.

    b. Throughout that employment, she has been at least 16 years of age.

    c. Throughout that employment, Grandberry has been paid on an hourly basis.

    d. Her nominal rate of pay throughout that employment has been $7.40 per hour.

    e. Grandberry's duties during that employment include, among other things, staffing the drive-through cash register, cleaning, bagging food, and delivering it to customers.

4

   f.   Grandberry's written consent to join this action is attached as Exhibit B to this Complaint.

13. **Dominique Stewart** is a Michigan resident.

   a.  From about February 2012 through the present, she has been employed at the McDonald's restaurant at 2889 West Grand Boulevard in Detroit, Michigan.

   b.  Throughout that employment, she has been at least 16 years of age.

   c.  Throughout that employment, Stewart has been paid on an hourly basis.

   d.  Her nominal rate of pay throughout that employment has been $7.40 per hour.

   e.  Stewart's duties during that employment include, among other things, cleaning, operating a cash register, working the grill, stocking items, and handing out food to customers at the drive-through window.

   f.   Stewart's written consent to join this action is attached as Exhibit C to this Complaint.

14. **Adrian Williams** is a Michigan resident.

   a.  From about March 2013 through the present, he has been employed at the McDonald's restaurant at 2889 West Grand Boulevard in Detroit, Michigan.

   b.  Throughout that employment, he has been at least 16 years of age.

   c.  Throughout that employment, Williams has been paid on an hourly basis.

   d.  His nominal rate of pay throughout that employment has been $7.40 per hour.

5

    e.  Williams' written consent to join this action is attached as Exhibit D to this Complaint.

15. Plaintiffs Pullen, Grandberry, Clark, Stewart, and Williams are "employee[s]" within the meaning of 29 U.S.C. § 203(e)(1) and Mich. Comp. Laws § 408.382(b).

16. This Complaint refers collectively to Plaintiffs Pullen, Grandberry, Clark, Stewart, and Williams as "**Plaintiffs**."

17. As alleged in more detail below, *see infra* ¶ 21(a)–(d), numerous other employees worked at McDonald's restaurants in Michigan owned and operated by ECS Partnership. The overwhelming majority of those employees were paid on an hourly basis to perform similar tasks to those performed by the Plaintiffs. This Complaint refers to those people as "**Crew Members.**"

## II.  The Defendants

18. **McDonald's Corporation** is a Delaware corporation.

    a.  Its principal place of business is One McDonald's Plaza, Oak Brook, Illinois 60523.

    b.  Its corporate system includes more than 35,000 restaurants, spanning all 50 states—including Michigan—and at least 119 countries worldwide.

    c.  On information and belief, these operations generated more than $27 billion in annual revenue each year during the period relevant to this action.

d. At all times relevant to this action, McDonald's Corporation has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

19. **McDonald's USA, LLC** is a Delaware corporation.

   a. It is a wholly-owned subsidiary of McDonald's Corporation.

   b. Its principal place of business is One McDonald's Plaza, Oak Brook, Illinois 60523.

   c. Its corporate system includes more than 14,000 restaurants throughout the United States and Canada, approximately 90% of which—over 12,000—are franchised.

   d. On information and belief, these operations have generated more than $8 billion in annual revenue each year during the period relevant to this action.

   e. At all times relevant to this action, McDonald's USA, LLC has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

20. This Complaint refers collectively and/or alternatively, as appropriate, to McDonald's Corporation and McDonald's USA, LLC as "**McDonald's Corporate**."

21. ECS Partnership d/b/a McDonald's Restaurant ("**ECS McDonald's**") is a Michigan business.

   a. On information and belief, ECS McDonald's maintains its principal place of business at 25300 Mound Road, Warren, Michigan.

7

b. On information and belief, ECS McDonald's operates approximately 16 restaurants in or around Detroit, Michigan, including at 9815 Grand River, Detroit, Michigan; 4200 Connor Avenue, Detroit, Michigan; 10400 Gratiot, Detroit, Michigan; 8825 East Jefferson, Detroit, Michigan; 2889 West Grand Boulevard, Detroit, Michigan; 16950 Harper Road, Detroit, Michigan; 19102 Woodward, Detroit, Michigan; 18201 Mack Avenue, Detroit, Michigan;17921 East 9 Mile Road, Eastpoint, Michigan; 9130 Joseph Campau, Hamtramck, Michigan; 17800 East 8 Mile Road, Harper Woods, Michigan; 14124 Woodward Avenue, Highland Park, Michigan; 22333 East 9 Mile Road, St. Clair Shores, Michigan; 23000 Van Dyke, Warren, Michigan; 11631 10 Mile Road, Warren, Michigan; and 23060 Groesbeck (Satellite), Warren, Michigan.

c. On information and belief, ECS McDonald's operates these restaurants pursuant to a franchise agreement with McDonald's Corporate.

d. On information and belief, during the relevant time period, ECS McDonald's has employed about 1,000 or more people to work in its 16 restaurants.

e. On information and belief, ECS McDonald's has generated at least $500,000 in annual gross volume or sales made or business done in each year during the period relevant to this action.

f. At all times relevant to this action, ECS McDonald's has been an enterprise engaged in commerce or in the production of goods for commerce, as those terms are used in 29 U.S.C. § 203(s).

8

22. McDonald's Corporation is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

23. McDonald's USA LLC is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

24. ECS McDonald's is an "employer" within the meaning of 29 U.S.C. § 203(d) and Mich. Comp. Laws § 408.382(c).

## General Allegations

### I.   McDonald's Corporate, along with ECS McDonald's, employs Plaintiffs and similarly situated Crew Members.

25. Under both the FLSA and the MWL (collectively, "**wage statutes**"), an employer "employs" an employee if it "suffer[s] or permit[s]" him or her "to work." 29 U.S.C. § 203(g); Mich. Comp. Laws § 408.382(d).

26. For the purposes of the wage statutes, a "single individual may stand in the relation of an employee to two or more employers at the same time … ." 29 C.F.R. § 791.2(a).

27. A master-servant relationship under traditional common-law agency principles is sufficient, but not necessary, to demonstrate an employment relationship for the purposes of the wage statutes.

28. Under traditional agency principles, a "servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." Restat. (Second) of Agency, § 220(1).

9

29. Even where a business does not exercise the degree of control necessary to employ a worker under traditional agency principles, the business will still be deemed an employer of that worker for the purposes of the wage statutes if economic reality, considered as a whole, reveals that the business suffered or permitted the worker to work.

### A. ECS McDonald's employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships.

30. Plaintiffs and similarly situated Crew Members perform services for ECS McDonald's, which controls or has the right to control the performance of those services.

31. ECS McDonald's hired Plaintiffs and similarly situated Crew Members.

32. ECS McDonald's has the power to fire or otherwise terminate the employment of Plaintiffs and similarly situated Crew Members.

33. ECS McDonald's, through its General Managers and Shift Supervisors, supervises and controls Plaintiffs' and similarly situated Crew Members' work schedules. ECS McDonald's managers typically post the weekly schedules for Plaintiffs and similarly situated employees on a weekly basis. Those schedules are generally posted in an area in the back of the restaurant. Plaintiffs and similarly situated Crew Members typically learn when they are scheduled to work either by reviewing the posted weekly schedule or by calling a manager and asking for their schedule for that week.

10

34. ECS McDonald's, through its General Managers and Shift Supervisors, supervises and controls other conditions of Plaintiffs' and similarly situated Crew Members' employment.

35. ECS McDonald's, through its General Managers and Shift Supervisors, also assigns Plaintiffs and similarly situated Crew Members to positions within each restaurant, such as cash register operator, drive-through front-booth order taker, drive-through back-booth food deliverer, food runner, grill operator, table operator / sandwich assembler, and cleaners and others with janitorial responsibility for maintaining the cleanliness of the lobby and restrooms.

36. ECS McDonald's determines the wage rates and methods of payment for Plaintiffs and similarly situated workers. On information and belief, ECS McDonald's, through its management, directly determines the nominal rate of pay for Plaintiffs and similarly situated Crew Members.

37. At all times relevant to this action, ECS McDonald's set each Plaintiff's nominal rate of pay at $7.40 per hour, or within 10 cents of that rate.

38. On information and belief, at all times relevant to this action, ECS McDonald's set each similarly situated Crew Members' nominal rate of pay at or close to $7.40 per hour.

39. On information and belief, ECS maintains certain employment records for Plaintiffs and similarly situated Crew Members. Those records include, among others, hours employees are scheduled to work; hours employees are recorded by the computer system as having worked; wages paid; discipline issued; and payroll taxes deducted.

11

**B. McDonald's Corporate, along with ECS McDonald's, employs the Plaintiffs and similarly situated Crew Members, within the statutory framework for employment relationships established by the wage statutes.**

40. McDonald's Corporate, along with ECS McDonald's, suffered or permitted Plaintiffs and similarly situated Crew Members to work.

**1) Like employees at all McDonald's restaurants, Plaintiffs and similarly situated Crew Members perform specialty jobs at ECS McDonald's on the production line developed and operated as the McDonald's System, which functions as an integrated economic unit.**

41. According to its public filings, McDonald's Corporate develops, operates, maintains, franchises, and services a system of restaurants that prepare assemble, package, and sell a limited menu of value-priced foods as the **"McDonald's System"** in the United States.

42. According to its public filings, the McDonald's System comprises a system of restaurant operations that includes, among other things, certain rights in trademarks, manuals, and other confidential business information; operational, real estate, and marketing information; and the expertise and continuing information that McDonald's Corporate provides to the component parts of the McDonald's System.

43. On information and belief, approximately 15,500 restaurants operate in the United States and Canada as the McDonald's System in those countries. According to its public filings, approximately 89% of those restaurants are operated as McDonald's franchised restaurants, like ECS McDonald's, and approximately 11% are owned and operated directly by McDonald's Corporate.

12

44. According to McDonald's Corporate's public filings, the McDonald's System is designed to offer the public a high standard of uniformity in food, service, and décor. Those filings also reveal that McDonald's Corporate has never offered franchises in any other line of business.

45. On information and belief, McDonald's Corporate has established a "**QSC Play Book**" that sets forth standards on Quality, Service, and Cleanliness McDonald's Corporate has established for the entire McDonald's System.

46. On information and belief, in the QSC Play Book, Jeff Stratton, McDonald's Corporate's Chief Restaurant Officer, states that "[e]ach time we deliver an exceptional customer experience, it brings our customers back, increases their brand loyalty, and makes the entire McDonald's system more profitable."

47. On information and belief, the QSC Play Book states that McDonald's System's "operations are composed of a set of systems that work together for the overall objective of the whole."

48. According to its public filings, McDonald's Corporate develops the overall direction and strategy for advertising and marketing programs throughout the McDonald's System. McDonald's Corporate permits franchisees, including ECS McDonald's, to use only advertising and marketing materials and programs that McDonald's Corporate has itself provided to McDonald's franchisees or approved in advance in writing.

49. On information and belief, McDonald's Corporate standard Franchise Agreement provides that "the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's Corporate providing for the

uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's Corporate prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation." The Franchise Agreement further provides that "[c]ompliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System."

50. On information and belief, McDonald's Corporate's standard Franchise Agreement requires the McDonald's Franchisee to acknowledge "that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparations methods, quality, and appearance; and uniformity of facilities and **service.**" (Emphasis added.)

51. According to its public filings, McDonald's Corporate generates substantial revenue by charging its franchised restaurants, like ECS McDonald's, a variety of fees. On information and belief, those fees are uniform across the McDonald's System and include:

    a.  an initial franchise fee, typically $45,000;

    b.  rent, assessed by McDonald's Corporate as the sum of monthly base rent (based upon the amount McDonald's Corporate invested in the

14

acquisition and development of the land and building used by the franchised restaurant) and an additional fixed percentage rent (also a function of McDonald's Corporate investment in the land and building, but payable only if the franchisee's monthly gross sales exceed the monthly base sales figure computed by dividing the dollar amount of the monthly base rent by the fixed percentage rent), both components of which are determined solely by McDonald's Corporate;

c.  a monthly service fee equivalent to 4% of gross sales revenues from business conducted at the franchised restaurants;

d.  fees for advertising, payable to local advertising cooperatives and McDonald's Corporate national advertising fund;

e.  fees for audits and inspections of the franchised restaurants by McDonald's Corporate, payable if the audit or inspection shows an understatement of at least 2% of the franchisee's gross sales;

f.  fees associated with software McDonald's Corporate requires its franchised restaurants to use, such as McDonald's Corporate proprietary "**Point of Sale**" software (the current version of which is called "**NewPOS**"), its "**Regional Restaurant Data Diagnostics**" or "**R2D2**" Software, Restaurant System Management software, Restaurant Integrated Data Movement software, software for McDonald's Corporate's back office suite, software used to manage the security of restaurant Crew Members, email accounts, and other technology required by McDonald's Corporate;

15

    g.  service fees to McDonald's Corporate for providing guarantees on loans for franchisees—a figure that alone exceeded $24 million in proceeds to McDonald's Corporate in 2012; and,

    h.  several other miscellaneous fees.

52. According to its public filings, the rent and fees McDonald's Corporate collects from McDonald's franchisees generated about $4.3 billion in revenue in 2012 for McDonald's USA LLC—nearly half of that Defendant's total revenue in 2012.

53. On information and belief, McDonald's Corporate also exercises substantial control over its franchisees' operations.

54. According to its public filings, McDonald's Corporate determines, in its sole discretion, the products that may be sold at restaurants in the McDonald's System, including franchised restaurants such as ECS McDonald's.

55. According to its public filings, McDonald's Corporate maintains uniformity throughout the McDonald's System by identifying standards for the purchasing, distribution, preparation, and service of goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software.

56. Those filings also reveal that McDonald's Corporate requires its franchisees to deal only with suppliers that McDonald's Corporate has approved.

57. According to its public filings, the purchases McDonald's Corporate requires of its franchisees—including items that must be purchased from McDonald's Corporate itself or from a McDonald's Corporate-approved supplier in accordance with McDonald's Corporate specifications—amounted, at all times

16

relevant to this action, to more than 90% of the cost of establishing a franchised restaurant and to approximately 60–67% of the cost of operating a franchised restaurant.

58. The McDonald's System accordingly functions in reality as a tightly integrated economic unit.

59. Plaintiffs and similarly situated Crew Members at ECS McDonald's perform work in a discrete role within the integrated economic unit that is the McDonald's System: they are the workers who prepare, cook, and deliver the food that is the McDonald's System's ultimate product in much of Detroit; they are the workers who clean the stores where that food is delivered; and they are the workers who deal directly with its customers.

60. The work performed by Plaintiffs and similarly situated Crew Members is comparable to and follows the usual path of work performed by hourly workers employed directly by McDonald's Corporate at its corporate-owned stores and by workers at other McDonald's stores operated as franchised restaurants in other locations.

2) **The responsibilities under McDonald's Franchise Agreements, like the one it has with ECS McDonald's, are materially the same across franchisees.**

61. On information and belief, McDonald's Corporate enters into the same, or materially the same, Franchise Agreement with each of the approximately 12,000 restaurants it franchises within the United States, including ECS McDonald's.

17

62. On information and belief, the material terms of the standard Franchise Agreement include, without limitation:

    a. a 20-year term;

    b. McDonald's Corporate's sole right, at its discretion, to renew or extend the Franchise Agreement at the end of the term;

    c. no right of the franchisee to terminate the Agreement;

    d. the right of McDonald's Corporate to terminate the Agreement for cause, including, among others, the failure to maintain the restaurant in a good, clean, wholesome manner and in compliance with McDonald's System standards, violation of franchise restrictions, knowing sale of foods other than those approved by McDonald's System or those that fail to conform to McDonald's System standards, denial of access to McDonald's, or any conduct that damages the McDonald's System's reputation;

    e. McDonald's Corporate's right of first refusal to acquire the franchisee's business by matching any offer; and,

    f. prohibitions on the franchisee's involvement in competing or similar business during the term of the franchise, and further prohibitions on involvement in competing business within 10 miles for 18 months after the termination or expiration of the franchise.

63. On information and belief, McDonald's franchisees, including ECS McDonald's, have insufficient bargaining power to negotiate different terms from those offered by McDonald's Corporate in its standard Franchise Agreement.

### 3) McDonald's Corporate's premises and equipment are used for Plaintiffs' and similarly situated Crew Members' work at ECS McDonald's.

64. According to its public filings, McDonald's Corporate selects the site where each of its franchised restaurants, including ECS McDonald's, will be located; franchisees, including ECS McDonald's, do not select or approve those locations.

65. According to its public filings, McDonald's Corporate owns the land and buildings used by its franchised restaurants, including ECS McDonald's, for their operations.

66. According to its public filings, McDonald's Corporate retains the right to access the premises of its franchisees, including ECS McDonald's, throughout the term of the Franchise Agreement.

67. According to its public filings, to ensure uniformity throughout the McDonald's System, McDonald's Corporate requires its franchisees, including ECS McDonald's, to use only equipment that meets standards established by McDonald's Corporate for purchasing, distribution, preparations and service of goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software.

68. On information and belief, ECS McDonald's, like other McDonald's franchisees, must purchase that equipment either directly from McDonald's Corporate or from McDonald's Corporate-approved suppliers.

69. On information and belief, all of the equipment Plaintiffs and similarly situated Crew Members use for their work at ECS McDonald's must meet the standards established by McDonald's Corporate for the McDonald's System.

19

4) **ECS McDonald's cannot, as a contractual or practical matter, shift its business organization as a unit from the McDonald's System to any other fast-food restaurant chain.**

70. On information and belief, the Franchise Agreement between ECS McDonald's and McDonald's Corporate contains a non-compete provision that completely prohibits ECS McDonald's from involvement during the term of that Agreement in any competing or similar business.

71. On information and belief, the Franchise Agreement between ECS McDonald's and McDonald's Corporate contains a non-compete provision that prohibits ECS McDonald's from involvement for 18 months after the end of the Agreement in any competing business within 10 miles of ECS McDonald's.

72. On information and belief, as a matter of economic reality in light of its substantial investments, ECS McDonald's cannot go into business with any fast-food restaurant chain other than the McDonald's System.

5) **McDonald's Corporate keeps close tabs on ECS McDonald's operation.**

73. On information and belief, McDonald's Corporate requires its franchisees, including ECS McDonald's, to use a variety of software applications—collectively referred to as "**Store Systems**."

74. According to public filings, the required Store Systems include:

   a. a proprietary hardware and software platform—called "**POS,**" for Point of Sale, or "**NewPOS**"—that is integrated to the service and production systems of McDonald's System restaurants;

b. the In Store Processor ("**ISP**"), which is a proprietary computer platform that uses server computer hardware that operates with other software McDonald's Corporate requires; and,

c. the Regional Restaurant Data Diagnostics system ("**R2D2**"), which provides restaurant operators with reports to improve restaurant operations and which McDonald's Corporate uses to verify sales information at restaurants throughout the McDonald's System.

75. On information and belief, the Store Systems integrate production and service systems in all McDonald's System restaurants and compile information including sales, transactions, product mix, and cash control.

76. On information and belief, the Store Systems also compile inventory, labor, and payroll information used in managing restaurants within the McDonald's System.

77. Plaintiffs and similarly situated Crew Members are required to clock in and out by logging into the Store Systems through the cash registers, using a unique employee identification number. On information and belief, McDonald's Corporate had the ability to, and in fact did, monitor the hours that franchisee employees—including Plaintiffs and similarly situated Crew Members—worked "on the clock," as reflected in the Store Systems.

78. On information and belief, the Store Systems calculate the "**labor cost percentage**" at any particular restaurant throughout the McDonald's System, including ECS McDonald's, by dividing (a) the wages, benefits, and other labor

21

costs associated with the store employees clocked in at any given time by (b) the gross sales revenue received by the store at that time.

79. According to public filings, McDonald's Corporate has independent access to restaurant-level information—including at ECS McDonald's—generated and tracked by the Store Systems, such as the labor cost percentage, and there are no contractual limits on McDonald's Corporate's right to access such information.

80. On information and belief, McDonald's Corporate does in fact closely monitor the information generated and tracked by the Store Systems, including the labor cost percentage at its franchised restaurants, including at ECS McDonald's.

81. On information and belief, McDonald's Corporate requires that the Store System is configured to generate a Daily Activity Report for all restaurants throughout the McDonald's System, including ECS McDonald's. On information and belief, these Daily Activity Reports include information about daily employee hours worked on the clock, sales made, the customer count, the drive-through window sales count, transactions per worker-hour, and the labor cost percentage of sales. On information and belief, these Daily Activity Reports are updated at least once per hour.

82. According to public filings, McDonald's Corporate also requires its franchisees, including ECS McDonald's, to provide monthly reports on restaurant receipts and other financial and operating information. On information and belief, McDonald's Corporate required these monthly reports to confirm the data previously reported by the Store Systems.

22

83. On information and belief, McDonald's Corporate also regularly audits and inspects franchisee operations, including at ECS McDonald's, through the use of Business Consultants, who are directly employed by McDonald's Corporate.

84. On information and belief, these Business Consultants conduct Full Operations Reviews and Short Operations Reviews multiple times per year.

85. On information and belief, during these reviews, McDonald's Corporate, through its Business Consultants, evaluates whether its franchisees—including ECS McDonald's—are meeting McDonald's System standards with respect to employee orientations, disciplinary policies and procedures, employee scheduling, employee wages, and employee training, among other matters.

86. In addition to these reviews, on information and belief, McDonald's Corporate also conducts "mystery shops" of its franchised restaurants, including ECS McDonald's. It typically does so on a monthly basis.

87. On information and belief, McDonald's Corporate uses these reviews and mystery shops to determine whether cause exists to terminate a given franchisee's Franchise Agreement or to fail to renew any Franchise Agreement that has reached the end of its term.

88. On information and belief, McDonald's Corporate also uses these reviews and mystery shops to make recommendations about how franchisee operations that fail to conform with standards—including Quality, Service, and Cleanliness ("**QSC**") standards—established by McDonald's Corporate can improve their performance.

23

6) **Although ECS McDonald's profits depend in part on the efficiency of its operation, the profitability of that franchised restaurant—like other McDonald's System restaurants—depends predominantly on decisions made by McDonald's Corporate and other factors outside of ECS McDonald's control, rather than on the initiative, judgment, or foresight of ECS McDonald's.**

89. According to its public filings, the purchases McDonald's Corporate requires of its franchisees—including items that must be purchased from McDonald's Corporate itself or from a McDonald's Corporate approved supplier in accordance with McDonald's Corporate specifications—amounted, at all times relevant to this action, to more than 90% of the cost of franchisees establishing their restaurants and to approximately 60–67% of the cost of franchisees operating their restaurants.

90. On information and belief, the extent of those start-up and operating costs McDonald's Corporate requires of its franchisees, including ECS McDonald's, dramatically circumscribes the ability of franchisees to make profit through their own initiative, judgment, or foresight. On the contrary, on information and belief, the profit opportunities for McDonald's franchisees, including ECS McDonald's, are predominately determined by decisions made by McDonald's Corporate and by other factors outside the control of ECS McDonald's.

### C. McDonald's Corporate, along with ECS McDonald's, also employs the Plaintiffs and similarly situated Crew Members, within the traditional common-law framework for master-servant employment relationships.

91. Plaintiffs and similarly situated Crew Members perform services for McDonald's Corporate, which controls or has the right to control the performance of those services.

24

1) **McDonald's Corporate substantially and effectively controls the hiring and firing of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants.**

92. On information and belief, McDonald's Corporate provides its franchisees, including ECS McDonald's, a "Retention & Staffing Guidebook," which covers everything McDonald's Corporate believes franchisees need to know and do to fully diagnose and manage their staffing situations.

93. On information and belief, McDonald's Corporate provides this Guidebook through the McDonald's Service Center to assist franchisees in retaining and hiring managers and Crew Members.

94. On information and belief, McDonald's Corporate provides its franchisees, including ECS McDonald's, a "Quality Hiring Training Manual," which instructs franchisees how to conduct reference checks as a necessary step in the hiring process.

95. On information and belief, McDonald's Corporate provides its franchisees, including ECS McDonald's, a "People Forecasting Tool," which instructs franchisees on how to predict their staffing needs—both for managers and for Crew Members.

96. As it does for every state in the United States, McDonald's Corporate maintains a website that lists all McDonald's System restaurants (whether franchised or corporate-owned), job opportunities, and events in Michigan. The Michigan-specific website is www.mcmichigan.com.

97. McDonald's Corporate uses this website to recruit managers and hourly employees to its restaurants, including franchised restaurants like ECS McDonald's. Specifically, in March 2014, McDonald's Corporate's McMichigan website advertised job openings at six or more restaurants operated by ECS McDonald's.

98.   On information and belief, the McDonald's Corporate's McMichigan website requires job applicants to answer a questionnaire as part of the application process. On information and belief, McDonald's Corporate developed the questionnaire. On information and belief, once a job applicant completes that questionnaire, McDonald's Corporate assigns a score to the candidate based on the answers provided; based on those scores, McDonald's Corporate then makes a recommendation to the owner and hiring manager of the restaurant—whether corporate-owned or franchised—that posted the job opening on whether the applicant is a good risk to hire.

99.   On information and belief, when McDonald's Corporate's Business Consultants conduct Full or Short Operations Reviews of restaurants within the McDonald's System—including franchised restaurants, like ECS McDonald's— they review, among other things, whether the restaurant is following the crew and management hiring and orientation process established by McDonald's Corporate.

26

> **2) McDonald's Corporate substantially and effectively controls the schedules of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants.**

100. On information and belief, McDonald's Corporate business manuals—including the Retention & Staffing Guidebook, the O&T Manual, the People Forecasting Tool, and other materials—provide McDonald's franchisees, including ECS McDonald's, detailed instructions for calculating the number of employees that should be staffed at varying intervals.

101. On information and belief, a manager at a McDonald's System restaurant creates weekly schedules by entering the date of a given week in the ISP, which uses historical sales data to project sales in that week. The ISP then uses those sales projections to generate a proposed schedule.

102. On information and belief, McDonald's Corporate then expects its restaurant managers—including those at franchised restaurants, like ECS McDonald's—to determine the variable labor needs on an hourly basis using the "**Positioning Guide,**" which is a guide developed by McDonald's Corporate to advise managers of restaurants throughout the McDonald's System of where to position workers within each store.

103. Once the manager has determined labor needs on an hourly basis, he or she can modify the proposed schedule generated by the ISP based on external events he or she expects. At this stage, the proposed schedule has not yet assigned particular employees to positions during a shift. Those assignments are then made either automatically if the manager has previously programmed ratings of

27

employees' proficiency at different positions, or manually if the General Manager has not preprogrammed the proficiency ratings.

104.  On information and belief, during Full and Short Operations Reviews McDonald's Corporate Business Consultants assess restaurants throughout the McDonald's System—including franchised restaurants, like ECS McDonald's—on whether Crew Members at a particular restaurant are positioned in accordance with projected transactions or sales and the recommended positioning guide.

105.  On information and belief, McDonald's Corporate develops labor cost percentage targets for each restaurant in the McDonald's System. On information and belief, for franchised restaurants, McDonald's Corporate develops the labor cost percentage target in consultation with the owner-operator of the restaurant. On information and belief, these targets vary based on, among other factors, the amount of capital McDonald's Corporate initially invested in establishing the restaurant.

106.  On information and belief, McDonald's Corporate advises, trains, and instructs store managers throughout the McDonald's System—including at franchised restaurants like ECS McDonald's—to adjust staffing levels and reduce employees' on-the-clock hours when the actual labor cost percentage exceeds the labor cost percentage target. On information and belief, a McDonald's manual instructs franchised restaurants in regard to "Critical ISP Reports" that "[y]ou need to set-up targets for when transactions are plus or minus so you can decide when to add or cut labor."

28

107.  Plaintiffs have each had their work schedules adjusted on multiple occasions when the actual labor cost percentage exceeded the labor cost percentage target for the restaurant where he or she works or worked.

108.  Managers have made these adjustments in a few ways. Sometimes they directed Plaintiffs or similarly situated Crew Members who arrived ready, willing, and able to work at the start of their scheduled shift to wait until the labor cost percentage no longer exceeded the labor cost percentage target before clocking in to work. On other occasions, Plaintiffs or similarly situated Crew Members had already clocked in when the labor cost percentage exceeded the target, and managers directed Plaintiffs or similarly situated Crew Members to clock out and take an unscheduled break until the labor cost percentage no longer exceeded the target before clocking back in to work.

109.  On information and belief, these adjustments were made in accordance with standards and practices established by McDonald's Corporate, as well as in accordance with training provided by McDonald's Corporate.

110.  On information and belief, McDonald's Corporate Business Consultants admonish restaurant managers to control labor costs and adjust labor to achieve labor cost percentage targets.

### 3) McDonald's Corporate substantially and effectively controls other employment conditions of workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants.

111.  According to its public filings, McDonald's Corporate has established and strictly enforces high quality standards and product specifications.

29

112.  According to its public filings, McDonald's Corporate's ability to increase sales and profits depends, among other things, on its ability to motivate its franchisees to achieve consistency and high service levels so as to improve perceptions of the McDonald's System's ability to meet expectations for quality food served in clean and friendly environments.

113.  On information and belief, McDonald's Corporate operates Hamburger University, the training center for the worldwide McDonald's System.

114.  On information and belief, McDonald's Corporate trains franchisee owners and operators, including those from ECS McDonald's, on a basic curriculum, known as the Restaurant Department Management curriculum. On information and belief, franchisee owners and operators must complete the Restaurant Department Management curriculum to be qualified to operate a McDonald's System restaurant. As part of this curriculum, McDonald's Corporate trains the franchisee owners and operators on how to meet McDonald's System standards in areas like equipment, standard operations, controls, and leading people.

115.  On information and belief, McDonald's Corporate also requires each franchised restaurant to have at least one General Manager who has completed training at Hamburger University.

116.  On information and belief, among other things, the Restaurant Department Management curriculum requires franchisees to complete a Department Manager Learning Plan on "Wage and Hour."

30

117.  On information and belief, any employee working as a Crew Member at any restaurant in the McDonald's System has to complete training provided by McDonald's Corporate to be promoted to a crew trainer, shift manager, or first assistant manager.

118.  On information and belief, McDonald's Corporate's Franchise Agreement obligates it to provide its franchisees, including ECS McDonald's, with McDonald's System business manuals, including its Operations and Training Manual ("**O&T Manual**"). Those manuals are incorporated by reference into the Franchise Agreement itself.

119.  According to McDonald's Corporate public filings, the O&T manual contains detailed information prepared by McDonald's Corporate, including the operations procedures McDonald's Corporate requires.

120.  On information and belief, the O&T Manual contains a chapter on Human Resources, which covers, among other things, McDonald's System philosophy and policies, Crew Member and management recruitment, Crew Member and Management selection, Crew Member and management retention, Crew Member and Management communication, performance development system for management, performance and wage reviews for hourly employees, recognition and incentives, handling terminations, people practice diagnostic tools, benefits and compensation, Crew rooms, uniforms, record retention and security, training and reference materials, and other information.

121.  On information and belief, the O&T Manual specifically advises franchisees, including ECS McDonald's, on federal wage and hour laws, standby

31

time, overtime pay, federal child labor laws, uniforms, and record retention, among other matters.

122. On information and belief, the O&T Manual establishes standards with which McDonald's Corporate expects franchisees, including ECS McDonald's, to comply in regards to uniforms and grooming.

123. On information and belief, the O&T Manual establishes standards with which McDonald's Corporate expects franchisees, including ECS McDonald's, to comply in regards to the retention of employment records, including which records must be retained, for how long, and by what methods.

124. On information and belief, the policies and procedures McDonald's Corporate sets forth in the Human Resources chapter of the O&T Manual and elsewhere substantially affect the relationship between Plaintiffs and similarly situated Crew Members, on the one hand, and ECS McDonald's, on the other.

125. On information and belief, during Full and Short Operations Reviews, McDonald's Corporate Business Consultants determine whether cashiers and other franchisee workers properly address customers, for example, by saying "Thank you. Please come again," rather than "Have a nice day." On information and belief, McDonald's Corporate Business Consultants grade franchises, including ECS McDonald's, on the service provided by these Crew Members.

126. On information and belief, McDonald's Corporate provides franchisees, including ECS McDonald's, guidelines on whether to give employees raises above the minimum wage, and, if so, when and how much. These guidelines are generally based on periodic performance reviews.

32

127.  On information and belief, when McDonald's Corporate's Business
Consultants conduct Full or Short Operations Reviews of restaurants in the
McDonald's System—including franchised restaurants, like ECS McDonald's—
the Consultants assess the restaurant's compliance with wage review policies
established by McDonald's Corporate.

128.  On information and belief, McDonald's Corporate has provided
employees throughout the McDonald's System—including those who work at
corporate-owned and at franchised restaurants—a "Practical Money Skills: Budget
Journal," which purports to advise employees how to learn to spend and save
wisely based on the wages they receive for their work in the McDonald's System
of restaurants. The sample monthly budget proposed by McDonald's Corporate
Budget Journal does not include among the monthly expenses any entry devoted to
clothes, much less to required work uniforms.

129.  On information and belief, McDonald's Corporate promulgates guidelines
to its restaurants, including franchisees like ECS McDonald's, that specify cooking
times to the second and temperatures to the degree.

130.  On information and belief, during Full and Short Operations Reviews
McDonald's Corporate Business Consultants assess restaurants, including
franchised restaurants like ECS McDonald's, on the amount of time down to the
second that it takes employees to serve customers at different positions throughout
the store.

33

**4) McDonald's Corporate maintains extensive employment records relating to the work performed by workers at its franchisees, including Plaintiffs and similarly situated Crew Members who work at ECS McDonald's restaurants.**

131.  As alleged above, McDonald's Corporate collects vast amounts of employment records relating to the work performed at its franchisees, including by Plaintiffs and similarly situated Crew Members. *See supra* ¶¶ 73–88.

132.  On information and belief, McDonald's Corporate does so through its Store Systems (*i.e.*, its POS, ISP, R2D2, and other required computer systems), which collect and record information relating to hours recorded as worked and labor costs (including the amounts paid in wages and benefits to Crew Members).

133.  On information and belief, this information is recorded in real-time at its franchised restaurants, including ECS McDonald's, and collected on a daily basis or more frequently at the discretion of McDonald's Corporate Business Consultants.

134.  On information and belief, McDonald's Corporate Business Consultants maintain records of the performance of franchisee employees, including Plaintiffs and similarly situated Crew Members, as observed by the Business Consultants in the course of their Full and Short Operations Reviews.

135.  On information and belief, as part of those Full and Short Operations Reviews, McDonald's Corporate Business Consultants also ensure that franchised restaurants, including ECS McDonald's, are themselves maintaining all employment records that McDonald's Corporate requires its franchises to maintain.

34

**II.    Plaintiffs and similarly situated Crew Members have been engaged to wait without receiving minimum wages—or any compensation at all—for that compensable work.**

136.  On information and belief, McDonald's Corporate maintains a practice or procedure of establishing a labor cost percentage target for each restaurant throughout the McDonald's System, including ECS McDonald's.

137.  On information and belief, McDonald's Corporate requires each restaurant throughout the McDonald's System, including ECS McDonald's, to monitor periodically throughout the day the actual labor costs as a percentage of sales revenue at that store.

138.  On information and belief, the R2D2 software provides hourly reports of actual labor costs and of sales and service, which together report the labor cost percentage. On information and belief, McDonald's Corporate has access to these hourly reports.

139.  On information and belief, when a restaurant's labor cost percentage exceeds its target, McDonald's Corporate expects its managers, including those at franchised restaurants like ECS McDonald's, to remove employees from the previously established work schedule to reduce labor costs.

140.  Each Plaintiff in this case has, on several occasions, reported to work as scheduled, ready, willing, and able to work, but, upon arrival, received a direction from his or her manager not to clock in at the scheduled time or, after clocking in, to take an extended or extra unpaid break. On those occasions, the manager has generally explained that the employee would not be permitted to clock in as scheduled or would have to go off the clock because "business is slow" or "labor

35

costs are high." The manager generally did not definitively inform any Plaintiff when he or she would be permitted to clock in; rather, the manager generally told each Plaintiff that he or she would have to wait for business to pick up or labor costs to go down before he or she would be allowed to clock in. On those occasions, each Plaintiff typically waited between 15 minutes and an hour, although sometimes more, before being permitted to clock in. Each Plaintiff usually waited on these occasions either in the lobby, the crew room in the back of the store, or the parking lot near the store. None of the Plaintiffs was able to use this waiting time effectively for his or her own purposes on any of these occasions. None of the Plaintiffs has been paid for the time he or she spent waiting on these occasions for labor costs to decrease.

    a. Pullen estimates that, on average, his managers have made him take an unpaid break three to four times a week for 30–60 minutes each time, when the managers have found the labor costs to have been too high. For much of his employment, his managers also made him wait 30–60 minutes after the scheduled start of his shift before clocking in. On these occasions, he generally waited in the crew room until his managers told him to clock in. He is aware of other Crew Members who also experienced these practices.

    b. Grandberry has often been told by her managers at the start of her scheduled shift not to clock in as scheduled, but instead to wait, when labor costs are high. She estimates that when this happened, she generally waited between 30 minutes and an hour before being allowed

36

to clock in. She generally waited on these occasions either in the crew room or in the lobby. She has seen many of her coworkers treated the same way.

c.  Stewart estimates that two to three times a week, she has reported to work at the time her shift was scheduled to start, but instead of being allowed to clock in, her managers told her that she had to wait to clock in because labor costs were high. She estimates that she has waited up to two hours on these occasions. She generally waits in the lobby, so that she can be available when her manager instructs her to clock in. She has seen her coworkers face the same treatment.

d.  Williams estimates that approximately six or seven times during his employment with McDonald's his managers told him at the beginning of his scheduled shift to wait to clock in because the store was "slow" or labor costs were high. On these occasions, he estimates that he generally waited between 30 minutes and one hour before being allowed to clock in. He generally waited either in or near the store, so that he could be available when needed. He has seen several coworkers receive similar instructions.

141.  On information and belief, similarly situated Crew Members have also had to wait to clock in or to take extended or extra mid-shift breaks due to labor cost percentages that exceeded the target established for ECS McDonald's.

III.   **Plaintiffs and similarly situated Crew Members have had the cost of their required uniforms deducted from their wages, driving those wages below the minimum wage required by the wage statutes.**

142.  The Plaintiffs and similarly situated Crew Members receive nominal rates of pay at or near $7.40 per hour.

143.  The Plaintiffs and similarly situated Crew Members are required, as a term of their employment, to wear uniforms to work. Those uniforms include, among other articles of clothing, shirts and hats bearing the McDonald's logo.

144.  Articles of clothing bearing the McDonald's logo are not generally suited to be worn on non-working occasions.

145.  The costs of purchasing these uniforms have been deducted from several Plaintiffs' wages, and, on information and belief, from the wages of numerous similarly situated Crew Members.

     a.  Pullen has had to buy approximately two shirts and a few hats per year as a condition of employment. Each time, the cost of these items was deducted from his paycheck. He has spoken with his coworkers about these uniform deductions, and those coworkers reported to him that they also had the cost of their uniforms deducted from their paychecks.

     b.  Grandberry had to purchase two shirts and a hat when she started working at McDonald's. The cost of each of those items was deducted from her paycheck. Since then, she has received two additional shirts, the cost of each of which was also deducted from her paycheck. Based on conversations she has had with her coworkers, she believes that

38

other Crew Members have also had the cost of their uniforms deducted from their paychecks.

c.   When she started working at McDonald's, Stewart received two shirts, one hat, and a name tag as her required uniform; the costs of these items were deducted from her paycheck. She has spoken with at least one coworker about the uniform deductions, and the coworker reported that she, too, had the cost of her uniform deducted from her paycheck.

d.   Williams received two McDonald's shirts and one McDonald's hat when he started work with McDonald's; the cost of each of those items was deducted from his paycheck. He has talked to some of his workers about the cost of uniforms, and those workers told him that they too had the costs of their uniforms deducted from their paychecks.

146.  Those deductions have caused several Plaintiffs and similarly situated Crew Members to receive regular rates of pay less than $7.40 per hour in some workweeks.

147.  Those deductions have caused several Plaintiffs and similarly situated Crew Members to receive regular rates of pay less than $7.25 per hour in some workweeks.

## IV.   Notwithstanding their extensive recordkeeping, McDonald's Corporate and ECS McDonald's have failed to keep fully accurate records required by law.

148.  On information and belief, neither McDonald's Corporate nor ECS McDonald's has kept accurate records of the time Plaintiffs and similarly situated

Crew Members spent waiting to clock in or on downtime breaks, as described above in ¶¶ 107–08.

149.  Those failures violate McDonald's Corporate's and ECS McDonald's obligations under 29 U.S.C. § 211 and applicable Department of Labor regulations.

## V.    McDonald's Corporate and ECS McDonald's have committed these violations willfully.

150.  On information and belief, McDonald's Corporate O&T Manual advises franchisees, including ECS McDonald's that "Federal wage and hour laws were created to protect the rights of employees. These laws ensure that employees are fairly paid for all hours worked and all hours for which employees are required to be present in the restaurant, such as standby time and training time." On information and belief, the McDonald's Corporate O&T Manual also recognizes that employees perform compensable work by appearing for an assigned shift and then being told by management to wait to clock in until business in the restaurant gets busier.

151.  In light of the foregoing, McDonald's Corporate and ECS McDonald's knew at all times relevant to this action of their obligations under the wage statutes.

152.  Despite that knowledge, McDonald's Corporate and ECS McDonald's unlawfully deprived Plaintiffs and similarly situated Crew Members of legally required compensation for all hours worked, both by failing to pay them for all hours that they were engaged to wait and by deducting the costs of uniforms from their wages. McDonald's Corporate and ECS McDonald's did so either knowing

40

that their conduct violated the wage statutes or in reckless disregard for whether their actions complied with the wage statutes.

**Collective Action Allegations**

153.  Plaintiffs hereby incorporate the allegations of all preceding paragraphs by reference as if set forth fully herein.

154.  Plaintiffs bring the FLSA claims in this action as a collective action under 29 U.S.C. §216(b).

155.  Plaintiffs assert those claims on behalf of themselves and of all similarly situated Crew Members employed by Defendants, or any one of them, who were not paid all compensation required by the FLSA during the relevant time period as a result of Defendants' compensation policies and practices, including its policies and practices relating to waiting-time and uniform deductions.

156.  Plaintiffs seek to notify the following Crew Members of their right under 29 U.S.C. § 216(b) to join this action by filing in this Court written notice of their consent to join the action:

> All individuals who worked at any time during the relevant time period for any restaurant owned or operated by ECS Partnership, and who were paid for their work on an hourly basis.

157.  The FLSA provides for a three-year statute of limitations for causes of action arising out of a willful violation of that Act. 29 U.S.C. § 255. As alleged above, *see supra* ¶¶ 150–52, Plaintiffs' and similarly situated Crew Members' claims arise out of Defendants' willful violations of the FLSA. Accordingly, the Court should require appropriate notice of this action be given to all Crew

41

Members employed by ECS Partnership within three years from the filing of this Complaint.

158.  On information and belief, ECS McDonald's has employed at least 1,000 Crew Members during the period relevant to this action.

159.  The identities of these Crew Members, as a group, are known only to the Defendants. Because the numerous members of this collective action are unknown to Plaintiffs, joinder of each member is not practicable.

160.  Because these similarly situated Crew Members are readily identifiable to the Defendants and may be located through their records, they may be readily notified of this action and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their FLSA claims.

161.  Collective adjudication is appropriate in this case because the Crew Members whom Plaintiffs wish to notify of this action have been employed in positions similar to the Plaintiffs; have performed work similar to the Plaintiffs; and have been subject to compensation practices similar to the Plaintiffs, including the unlawful waiting-time and uniform-deduction policies and practices alleged above. *See supra* ¶ 108.

### Class Action Allegations

162.  Plaintiffs hereby incorporate the allegations of all preceding paragraphs by reference as if set forth fully herein.

163.  Plaintiffs bring their state-law claims in this action as a class action under Fed. R. Civ. P. 23(b)(3).

164.  Plaintiffs seek Rule 23 certification of the following class ("**Class**"):

> All individuals who worked at any time during the relevant time period for any restaurant owned or operated by ECS Partnership, and who were paid for their work on an hourly basis.

165.  The MWL provides for a three-year statute of limitations. Mich. Comp. Laws § 408.393(1). The relevant time period therefore dates back three years from the date on which this Complaint was filed and continues forward through the date of judgment.

166.  The individuals in the Class are so numerous that joinder of all members is impracticable. Although the precise number of ECS McDonald's Crew Members is currently unknown to the Plaintiffs, Plaintiffs belief that the Class contains at least 1,000 individuals.

167.  There are questions of law or fact common to the Class. These questions include, but are not limited to:

a.  whether ECS McDonald's employs the Class members;

b.  whether McDonald's Corporate employs the Class members;

c.  whether McDonald's Corporate and/or ECS McDonald's maintains a policy or practice of engaging its employees to wait without paying them minimum wages as required by the wage statutes; and,

d.  whether McDonald's Corporate and/or ECS McDonald's maintains a policy or practice of deducting the cost of uniforms from its employees, thereby driving their effective wages below the minimum wages required by the wage statutes.

43

168.  The questions of law or fact common to the Class are capable of classwide resolution, as follows:

    a. Whether ECS McDonald's employs the Class members can be proven based on employment records ECS McDonald's maintains, examination of which will not require individualized inquiries at trial.

    b. Whether McDonald's Corporate employs the Class members can be proven through an examination of economic reality and, in particular, of the economic relationship between ECS McDonald's and McDonald's Corporate. The nature of that relationship is an objective matter that will resolve the question of McDonald's Corporate's employment relationship with the Class members in one stroke, without the need for individualized inquiries at trial.

    c. Whether McDonald's Corporate and/or ECS McDonald's maintains a policy or practice of engaging Class members to wait without paying them lawfully required minimum wages can be proven through analysis of Defendant's scheduling records, records of hours worked, payroll records, records of labor cost percentage targets, and records of actual labor cost percentages. Because these records are objective evidence, their analysis will resolve the question of compensable waiting time in one stroke, without the need for individualized inquiries at trial.

    d. Whether McDonald's Corporate and/or ECS McDonald's maintains a policy or practice of deducting the cost of required uniforms from Class members and effectively driving their wages below lawful minimums

44

can be proven through invoice and payroll records. Because these records are objective evidence, their analysis will resolve the question of uniform deductions in one stroke, without the need for individualized inquiries at trial.

169.  Plaintiffs' claims are typical of those of the Class. Plaintiffs, like other Class members, were denied lawfully required minimum wages under the wage statutes on account of the waiting-time and uniform-deduction claims alleged here. Plaintiffs challenge these common practices under legal theories common to all Class members.

170.  Plaintiffs and undersigned counsel are adequate representatives of the Class. Plaintiffs are Class members, with concrete incentives to prosecute this action. Plaintiffs are committed to the prosecution of this action. Plaintiffs have no known interests that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class. Plaintiffs have retained counsel experienced in class action litigation, including disputes involving wage statutes.

171.  The questions of law and fact set forth above, *supra* ¶ 167(a)–(d), predominate over any questions affecting only individual Class members, because they are capable of classwide resolution without the need for individualized inquiries at trial.

172.  A class action is superior to other methods for the fair and efficient adjudication of this matter.

45

**First Cause of Action: Waiting-Time Violations of the FLSA**

173.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

174.  At relevant times, ECS McDonald's suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. § 203(g).

175.  At relevant times, McDonald's Corporate suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. §203(g).

176.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under 29 U.S.C. §206(a) to wages at rates not less than $7.25 per hour for the hours they worked.

177.  At times within the relevant time period, Plaintiffs and similarly situated Crew Members were engaged to wait and thus performed compensable work, but received no compensation for that work.

178.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under 29 U.S.C. § 216(b), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Second Cause of Action: Uniform-Deduction Violations of the FLSA**

179.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

180.  At relevant times, ECS McDonald's suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. § 203(g).

181.  At relevant times, McDonald's Corporate suffered or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of 29 U.S.C. §203(g).

182.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under 29 U.S.C. §206(a) to wages at rates not less than $7.25 per hour for the hours they worked.

183.  Under 29 U.S.C. § 203(m), wages paid to any employee include the reasonable cost to the employer of furnishing certain facilities provided by the employer to an employee primarily for the benefit and convenience of the employee.

184.  Where an employer requires an employee to wear a uniform as a condition of employment, the cost of that uniform is primarily for the benefit and convenience of the employer, not the employee. 29 C.F.R. § 531.3(d)(2). The cost of such uniforms accordingly cannot be credited toward "wages" paid to an employee.

185.  Defendants required Plaintiffs and similarly situated Crew Members to pay for the costs of their required McDonald's uniforms. When they did so, the Defendants deducted those costs from Plaintiffs' and similarly situated Crew Members' wages, driving their effective wages below the $7.25 hourly rate required under 29 U.S.C. § 206(a).

47

186.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under 29 U.S.C. § 216(b), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

### Third Cause of Action: Waiting-Time Violations of the MWL

187.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

188.  At relevant times, ECS McDonald's engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws § 408.382(d).

189.  At relevant times, McDonald's Corporate engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws § 408.382(d).

190.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under Mich. Comp. Laws § 408.384(d) to wages at rates not less than $7.40 per hour for the hours they worked.

191.  At times within the relevant time period, Plaintiffs and similarly situated Crew Members were engaged to wait and thus performed compensable work, but received no compensation for that work.

192.  The Defendants are liable to Plaintiffs and similarly situated Crew Members, under Mich. Comp. Laws § 408.393(1), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Fourth Cause of Action: Uniform-Deduction Violations of the MWL**

193.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

194.  At relevant times, ECS McDonald's engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws §408.382(d).

195.  At relevant times, McDonald's Corporate engaged, suffered, or permitted Plaintiffs and similarly situated Crew Members to work within the meaning of Mich. Comp. Laws §408.382(d).

196.  At all times relevant to this action, Plaintiffs and similarly situated Crew Members have been entitled under Mich. Comp. Laws § 408.384(d) to wages at rates not less than $7.40 per hour for the hours they worked.

197.  Although the MWL does not expressly define "wages," it is interpreted in accordance with the use of that term under the FLSA.

198.  Under 29 U.S.C. § 203(m), wages paid to any employee include the reasonable cost to the employer of furnishing certain facilities provided by the employer to an employee primarily for the benefit and convenience of the employee.

199.  Where an employer requires an employee to wear a uniform as a condition of employment, the cost of that uniform is primarily for the benefit and convenience of the employer, not the employee. 29 C.F.R. §531.3(d)(2). The cost of such uniforms accordingly cannot be credited toward "wages" paid to an employee.

49

200. Defendants required Plaintiffs and similarly situated Crew Members to pay for the costs of their required McDonald's uniforms. When they did so, the Defendants deducted those costs from Plaintiffs' and similarly situated Crew Members' wages, driving their effective wages below the $7.40 hourly rate required under Mich. Comp. Laws § 408.384(d).

201. The Defendants are liable to Plaintiffs and similarly situated Crew Members, under Mich. Comp. Laws § 408.393(1), for their unpaid wages, liquidated damages (equal to the amount of unpaid wages), reasonable attorney's fees and costs, and any other relief deemed appropriate by the Court.

**Fifth Cause of Action: Breach of Contract Under Michigan Common Law**

202. Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

203. By scheduling Plaintiffs and similarly situated Crew Members to work, ECS McDonald's and McDonald's Corporate offered to pay those workers at least their nominal rate of pay for all hours scheduled.

204. By reporting to work as scheduled, Plaintiffs and similarly situated Crew Members accepted Defendants' offers.

205. Based on the schedules offered, Plaintiffs and similarly situated Crew Members had a legitimate expectation that they would be permitted to work as scheduled.

206. Defendants' offers and Plaintiffs' and similarly situated Crew Members' acceptances together formed a contract.

50

207.  Defendants breached that contract by refusing to pay Plaintiffs and similarly situated Crew Members for all hours they had been scheduled to work.

208.  Defendants are liable to Plaintiffs and similarly situated Crew Members for actual and consequential damages on account of their breach of contract.

### Sixth Cause of Action: Unjust Enrichment (Quantum Meruit) Under Michigan Common Law

209.  Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

210.  By scheduling Plaintiffs and similarly situated Crew Members to work, but paying those workers to work only when the labor cost percentage did not exceed the target, McDonald's Corporate and ECS McDonald's obtained a substantial benefit—namely, a just-in-time supply of labor. Because McDonald's Corporate and ECS McDonald's failed to pay for that benefit, they were unjustly enriched, to the detriment of Plaintiffs and similarly situated Crew Members.

211.  McDonald's Corporate and ECS McDonald's appreciated and knew of the benefits being conferred upon them by Plaintiffs and similarly situated Crew Members who were engaged to wait.

212.  McDonald's Corporate and ECS McDonald's conduct was willful and not the result of mistake or inadvertence. In consequence, it would be inequitable for McDonald's Corporate or ECS McDonald's to retain the benefits they received without paying for the value of those benefits.

213.  Defendants are liable to Plaintiffs and similarly situated Crew Members in quantum meruit, together with an award of interests and costs.

51

**Jury Demand**

214.  Plaintiffs respectfully request a jury trial on all matters so triable.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully pray for the following relief from this Court:

    (a) Certify the federal-law claims in this case as a collective action under Section 16(b) of the FLSA, 29 U.S.C. § 216(b);

    (b) Require that notice of their right to join this action by filing with this Court written consent to do so be given to all Crew Members similarly situated to Plaintiffs;

    (c) Certify the state-law claims in this case as a class action under Fed. R. Civ. P. 23;

    (d) Grant judgment against Defendants, jointly and severally, and in favor of each Plaintiff and similarly situated Crew Member on all claims in this case;

    (e) Award each Plaintiff and similarly situated Crew Member all unpaid wages required by law;

    (f) Award each Plaintiff and similarly situated Crew Member all liquidated damages provided by law;

    (g) Award each Plaintiff and similarly situated Crew Member all other nominal, compensatory, or statutory damages, or damages of any other kind;

    (h) Award restitution of all monies due Plaintiffs and similarly situated Crew Members, as well as all disgorged profits from the unlawful business practices of Defendants;

    (i) Award interest;

52

(j)  Award reasonable attorney's fees and costs;

(k)  Grant all other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ David P. Dean
Edgar N. James (D.C. Bar No. 333013)
David P. Dean (D.C. Bar No. 437030)
Jeff Vockrodt (D.C. Bar No. 985635)
Darin M. Dalmat (D.C. Bar No. 978922)
Ryan E. Griffin (D.C. Bar No. 1007078)
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave., Suite 950, NW
Washington, DC 20036
202-496-0500
202-496-0555 (fax)
ejames@jamhoff.com
dpdean@jamhoff.com
jvockrodt@jamhoff.com
dmdalmat@jamhoff.com
regriffin@jamhoff.com

John R. Canzano (MI Bar No. P30417)
Darcie R. Brault (MI Bar No. P43864)
McKNIGHT, McCLOW, CANZANO, SMITH &
RADTKE, P.C.
400 Galleria Officentre, #117
Southfield, MI 48034
248-354-9650
248-354-9656 (fax)
jcanzano@michworklaw.com
dbrault@michworkerlaw.com

Date: March 13, 2014